**B. Allan BENSON, Regional Director of Region 27 of the National Labor Relations Board on behalf of the National Labor Relations Board, Plaintiff,**

v.

**UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, LOCALS 184 AND 1498, Defendants.**

No. 2:04–CV–00782 PGC.

United States District Court,
D. Utah,
Central Division.

Sept. 27, 2004.

Scott Patrick Bates, Esq., U.S. Attorney's Office, William J. Daly, Esq., National Labor Relations Board, Denver, Co, for Plaintiff.

Jerrald D. Conder, Esq., Salt Lake City, UT, for Defendants.

**MEMORANDUM OPINION DENYING MOTION FOR TEMPORARY INJUNCTION**

CASSELL, District Judge.

Plaintiffs Mr. Benson and the National Labor Relations Board ("NLRB") have filed a motion seeking a temporary injunction under National Labor Relations Act ("NLRA") pending final disposition of unfair labor practice charges currently pending before the NLRB.[1] Defendants United

---

1. 29 U.S.C. § 160(1) ("Section 10(1)").

Brotherhood of Carpenters and Joiners of America Locals 184 and 1498 (the "Union") oppose the motion. In brief, the Union has peacefully displayed stationary banners outside some businesses that have hired two general contractors to perform work. The Union believes that these contractors have acted unfairly or illegally with respect to various union members. To protest these actions, the Union has erected banners in public places which read "Labor Dispute—SHAME ON [Name of Business]—Labor Dispute."

The NLRB alleges that these actions by the Union constitute a "secondary boycott"—that is, that the Union has directed economic coercion against a "neutral" employer that is unconcerned with the Union's primary labor dispute. The NLRB has raised precisely the same arguments in identical situations before two other district courts. The NLRB has lost both times before. The NLRB is now 0-for-3—this court agrees with the two other district courts that peacefully placing a stationary banner in a public place and handing out handbills decrying a "labor dispute" is not a proscribed secondary boycott under the NLRA.

### Background

The facts of this case are in all relevant particulars undisputed. The Union has been engaged in a labor dispute with New Star General Contractors ("New Star") and Okland Construction, two construction companies based in Utah. To publicize its dispute with these companies, union members have been displaying banners and handing out leaflets at businesses related to Okland and New Star projects. The businesses typically have chosen to use either Okland or New Star as a subcontractor on one of their projects.

The activity of the Union in the various locations is essentially the same. Union members—typically one or two individuals, with occasionally as many as four—display a sign that is approximately four feet high and twenty feet long. The banner reads in large red letters "SHAME ON [Name]" and then lists the name of a business. In smaller black letters the signs display the words "Labor Dispute."

The banners do not block ingress or egress into any of the businesses, are not directed at employees, and are typically posted on public property. The Union places the banners in visible locations such as intersections and public sidewalks. The banners face the driving public, not the businesses. The Union members do not shout slogans. Instead, they simply stand, hold the banner, and hand out leaflets to those who ask. The leaflets do not advocate a consumer boycott, but instead urge the recipient to ask the business to contact New Star and Okland and ask them to stop their illegal conduct. Apparently similar activity by the United Brotherhood of Carpenters is ongoing in both California and Arizona.[2]

In response to these Union actions, fifteen businesses entities (including New Star and Okland) filed complaints with the NLRB's Region 27 alleging that the Union's use of the banners and accompanying leaflets were an unfair labor practice in violation of the NLRA. The NLRB investigated these complaints and responded by filing the pending petition for injunctive relief in this court on August 27, 2004.

### Discussion

■ The Tenth Circuit has directed that in considering injunctive relief under § 10(*l*) of the NLRA[3] this court should

---

**2.** See *Kohn v. Southwest Regional Council of Carpenters,* 289 F.Supp.2d 1155 (C.D.Cal. 2003), *and Overstreet v. United Brotherhood of* *Carpenters and Joiners,* CV 04–1849 (D.Ariz. 2004).

**3.** 29 U.S.C. § 160(1).

consider whether there exists (1) "reasonable cause to believe" that the Union violated the NLRA, and (2) whether the relief sought is "just and proper." [4] The court will therefore consider each of the two prongs in turn.

### A. Reasonable Cause

To establish "reasonable cause" for believing that the Union has violated the NLRA, the NLRB must produce some evidence that its position is "fairly supported by the evidence." [5] The NLRB must convince this court that its theory of liability is "valid, substantial and not frivolous." [6] The court need only find that the NLRB's evidence is sufficient to "permit a rational fact finder, considering the evidence in the light most favorable to the Board, to rule in favor of the Board." [7] Reasonable cause to believe that an unfair labor practice has occurred is a factual finding.[8]

The NLRB has alleged that the Union bannering violates Section 8(b)(4)(ii)(B) of the NLRA. This section focuses on Union activity that creates a "secondary" boycott and makes it "an unfair labor practice for a labor organization ... to *threaten, coerce, or restrain* a person not party to a labor dispute where ... an object thereof is ... forcing or requiring [him] to ... cease doing business with any other person." [9] The intent underlying this section is to shield unoffending businesses from coercive pressures in controversies not their own.[10] However, the provision does not bar all actions by the Union that might conceivably have some indirect effect on the unoffending business. In particular, a provision of 8(b)(4)(ii)(B) excepts "publicity, other than picketing, for the purpose of truthfully advertising to the public ... that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by an person other than the primary employer in the course of his employment to refuse to pick up, deliver, or transport any good, or not to perform any services, at the establishment of the employer engaged in such distribution." [11] The question before this court, then, devolves to whether the Union's activity constitutes an illegal secondary boycott (as alleged by the NLRB) or is merely "publicity" regarding their dispute with New Star and Okland (as alleged by the Union).

To prove an illegal secondary boycott, the NLRB must present facts to support a finding that the union engaged in conduct that "threatened, coerced or restrained" any secondary party and that the objective of such conduct was to pressure the primary employers by forcing the secondary parties to cease doing business with the primary employers.[12] The Supreme Court

---

**4.** *Sharp ex rel. N.L.R.B. v. Webco Industries, Inc.,* 225 F.3d 1130, 1133–34 (10th Cir.2000)(internal citations omitted).

**5.** *Id.* (internal citations omitted).

**6.** *Id.*

**7.** *Id.*

**8.** *See id.* at 1134.

**9.** 29 U.S.C. § 158(b)(4)(ii)(B) (emphasis added), *discussed in N.L.R.B. v. Retail Store Emp.*

Union, Local 1001, 447 U.S. 607, 611, 100 S.Ct. 2372, 65 L.Ed.2d 377 (1980).

**10.** *See N.L.R.B. v. Denver Bldg. and Const. Trades Council,* 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284 (1951).

**11.** *NLRB v. Fruit and Vegetable Packers and Warehousemen, Local 760,* 377 U.S. 58, 59, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964), *quoting* 29 U.S.C. § 158(b)(4)(ii)(B).

**12.** 29 U.S.C. § 158(b)(4)(ii)(B).

has helpfully analyzed the concept of "threat, coercion, or restraint" in its 1988 decision in *Edward J. DeBartolo Corp. v. Florida Gulf Coast Building and Construction Trades Council ("DeBartolo II)*.[13] There the Court considered the NLRB's claim that union handbilling activities at shopping mall entrances, urging customers not to shop at any of the mall's stores until the mall's owner promised that all construction would be done by contracts paying fair wages, did not violate the NLRA. The Court noted that "more than mere persuasion is necessary to prove a violation of § 8(b)(4)(ii)(B): that section requires a showing of threats, coercion, or restraints. Those words ... are nonspecific, indeed vague, and should be interpreted with caution and not given a broad sweep."[14] The Court concluded there was no "necessity to construe such language to reach the handbills involved in this case. There is no suggestion that the leaflets had any coercive effect on customers of the mall. There was no violence, picketing, or patrolling and only an attempt to persuade customers not to shop in the mall."[15] The Court continued to discuss the fact that some of the mall's customers might decide not to do business with the mall. The Court concluded, however, that this fact would not constitute a proscribed secondary boycott because mere handbilling, without picketing, does not "coerce" secondary employers. The Court explained:

> The loss of customers because they had a handbill urging them not to patronize a business, and not because they are intimidated by a line of picketers, is the result of mere persuasion, and the neutral who reacts is doing no more than

what its customers honestly want it to do.[16]

The Court warned that any broader reading of the statute, as urged by the NLRB, would effectively prohibit newspaper, radio, and television appeals not to patronize the mall, a prohibition that would raise serious First Amendment concerns.

■ Here we have the functional equivalent of the handbilling that the Supreme Court approved in *DeBartolo II*. The only thing before the court is handbilling—accompanied by a banner. The NLRB raises no allegation that union representatives shouted, patrolled, blocked entrances, acted aggressively, or even initiated verbal conversations with the public. The court has before it no evidence whatsoever that the banners provided any "deterrent" to individuals who want to enter the businesses in question. Instead of finding coercion in the Union's actions, the NLRB focuses on the Union's *message*—that the Union's banners might end up convincing the public to urge businesses not to hire New Star and Oakland. This is precisely the argument *DeBartolo II* rejected. As the Court explained (citing relevant legislative history), a "union can hand out handbills at the shop, can place advertisements in newspapers, can make announcements over the radio, and can carry on *all publicity short of having ambulatory picketing in front of a secondary site."*[17] Here we have nothing more than publicity (to wit, large banners) short of ambulatory picketing (the Union members simply handout handbills to interested persons) close to secondary sites (public places adjacent to businesses who filed complaints with the

---

**13.** 485 U.S. 568, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988).

**14.** *Id.* at 578, 108 S.Ct. 1392.

**15.** *Id.*

**16.** *Id.* at 580, 108 S.Ct. 1392.

**17.** *Id.* at 587, 108 S.Ct. 1392 (internal quotation omitted) (emphasis added).

NLRB). This is not activity proscribed by the NLRA.

One other analogy may be instructive. At oral argument, the NLRB conceded that it would be constitutionally permissible for the Union to erect a billboard—with the same message—twenty feet from the entrance of a secondary business. Essentially the Union has combined two constitutionally protected activities—use of a billboard to publicize their message and handbilling. When these two protected activities do not involve threats, coercion, or restraint, there is no violation of the statute.

Two district courts have recently reviewed virtually the same behavior that is at issue here. Both courts concluded that Union members peacefully standing with a banner on the side of a road did not amount to a violation of the NLRA.[18] In *Kohn v. Southwest Regional Council of Carpenters*,[19] the District Court for the Central District of California rejected a request for a temporary injunction by the NLRB against the Southwest Regional Council of Carpenters Local 209 ("Local 209"). Local 209 had a dispute with the Carignan Construction Company and displayed the same banner used here at Silver Star Cadillac, a business that had chosen Carignan as a subcontractor. The "SHAME ON [Name]" banner was used, and the court addressed the question of whether this bannering constituted a "threat, coercion or restraint" in violation of the NLRA.[20] Relying heavily on Supreme Court precedent, the court held:

> The Regional Director has failed to persuade the Court that he has any reasonable prospect of proving at trial that the

display of the banner violates the statute. On the contrary, this Court concludes that, under controlling Supreme Court precedent, the conduct of the union members in displaying the banner falls outside the scope of § 8(b)(4)(ii)(B)'s prohibition against activities that threaten, coerce, or restrain. *DeBartolo II* teaches that the NLRB's proposed construction, which would outlaw the union's mere display of the banner at the work site, raises serious *First Amendment* issues that need not be confronted because of the availability of a reasonable, alternative construction that conforms to congressional intent and the legislation's purposes. In short, the reasoning of DeBartolo II demonstrates that the Regional Director's petition for a temporary injunction based on a discredited construction of the statute, is meritless.[21]

The court concluded, under the traditional four-part test for preliminary injunctions, that the NLRB had not demonstrated the likelihood of success on the merits based on *DeBartolo II*.

The Southern District of California also addressed the identical issues presented here in *Overstreet v. United Brotherhood of Carpenters and Joiners of America, Local Union No. 1506* in May 2003.[22] In that case, Local 1506 had a dispute with three contracting companies. Local 1506 displayed the same "SHAME ON" banner at thirteen different secondary businesses throughout the San Diego area. The court denied the NLRB's request for an injunction.[23] The court quoted directly from *DeBartolo II*, noting:

---

**18.** *See Overstreet*, 03–0773 (S.D.Cal. May 7, 2003), and *Kohn*, 289 F.Supp.2d at 1167.

**19.** 289 F.Supp.2d 1155.

**20.** *Id.* at 1155.

**21.** *Kohn*, 289 F.Supp.2d at 1159 (internal citations omitted).

**22.** Civil No. 30–0773 J(JFS).

**23.** *Id.* at 5.

In *DeBartolo II,* the Supreme Court stated that "our decision in *Tree Fruits* ... makes untenable the notion that *any* kind of handbilling, picketing, or other appeals to a secondary employer to cease doing business with the employer involved in the labor dispute is 'coercion' within the meaning of § 8(b)(4)(ii)(B) if it has some economic impact on the [secondary]." [24] Respondent's conduct does not rise to the level of threats, coercion or restraint that characterize an unlawful secondary boycott. [25]

Here, the NLRB has presented no evidence demonstrating that any of the businesses in question suffered any economic impact. And again, the NLRB has failed to demonstrate how the Union's activities rise to the necessary level of "threats, coercion or restraint" justifying the strong remedy of a prior restraint on the Union's speech.

In an effort to avoid this conclusion, the NLRB also contends that the information on the banners here is false and thus is inherently coercive. The banners do not directly mention the dispute with New Star and Okland. Thus, contends the NLRB, the use of the term "labor dispute" creates the misleading "impression" [26] that the dispute is actually with the secondary employer. As a matter of legal technicalities, Congress in the NLRA seemingly indicated that a "labor dispute" did not depend on "whether or not the disputants stand in the proximate relation of employer and employee." [27] Accordingly, the secondary businesses and the Union might indeed have a labor dispute within the technical meaning of the NLRA. The accu-

racy of the phrase "labor dispute" does not require parsing these banners with such exactness. The banners are displayed to the motoring public and thus can contain only a few words. They can hardly be expected to contain much more than a pithy, powerful slogan. In any event, the banners truthfully reveal to the public what would commonly be understood to be a kind of labor dispute—e.g., a dispute about whether the businesses in question should continue to work with Okland and New Star. The details of this dispute, even the NLRB concedes, are accurately recounted in the handbill that the Union provides to passersby who ask. The banners are, in short, truthful and therefore cannot create some sort of coercive effect that might violate the NLRA. As the District Court for the Central District of California has concluded: "[T]he union's banner, which is plainly designed to get the attention of members of the public in the hope of stimulating further inquiry into the dispute, is not 'false' simply because it fails to inform the public as to whom the union has its 'primary,' as opposed to 'secondary' dispute ...." [28]

### B. *Just and Proper*

For the foregoing reasons, the NLRB has failed to establish reasonable cause to believe that unfair labor practices have occurred. Even if such cause had been established, however the court would have to consider whether injunctive relief was "just and proper." [29] The injunctive provisions of the NLRA were designed to give the NLRB a means of preserving the status quo pending the completion of NLRB

---

**24.** Citing *DeBartolo II,* 485 U.S. at 579, 108 S.Ct. 1392 (emphasis in original).

**25.** *Overstreet,* at 5.

**26.** Memorandum of Points and Authorities in Support of Petition for Injunction Under Sec-

tion 10(1) of the National Labor Relations Act, p. 40.

**27.** 29 U.S.C. § 113(c).

**28.** *Kohn,* 289 F.Supp.2d at 1169.

**29.** *Webco,* 225 F.3d at 1135.

review of the case.[30] The court need grant injunctive relief only to the extent it is "reasonably necessary to preserve the ultimate remedial power of the Board and is not a substitute for the exercise of that power." [31]

Injunctive relief in this case would raise very serious First Amendment issues. Injunctive relief forbidding peaceful banners might well be tantamount to an impermissible prior restraint. In view of the court's conclusion that the NLRB has failed to establish reasonable cause for injunctive relief, the court need not reach these difficult constitutional questions.

## CONCLUSION

The banners at issue in this case—unaccompanied by any threats, picketing, or other coercive behavior—do not warrant injunctive relief. Accordingly, the NLRB's motion for injunctive relief is denied. The court recognizes that the NLRB retains the ultimate power to enforce the NLRA, and thus this holding does not decide with finality the issue of whether an unfair labor practice has occurred.[32] However, because the request for an injunction is the only matter before the court and because the NLRB proceedings will reach a final adjudication on the merits in an administrative proceeding, the Clerk of the Court is directed to close this case.

---

**30.** *Id.*

**31.** *Id.*

**32.** *Lawrence Typographical Union No. 570 v. Sperry For and On Behalf of N.L.R.B.,* 356 F.2d 58, 59 (10th Cir.1966).